**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 24-35761 (JPN) |
| JETALL COMPANIES, INC., | § | |
| | § | Chapter 11 |
| Debtor. | § | |

---

### NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, HOUSTON 2425 GALLERIA, LLC, AND CHRISTOPHER R. MURRAY, LIQUIDATION TRUSTEE'S JOINT MOTION TO CONVERT CASE TO CHAPTER 7

---

> **This motion seeks an order that may adversely affect you. If you oppose the motion, you should immediately contact the moving party to resolve the dispute. If you and the moving party cannot resolve the dispute, you must file a response and send a copy to the moving party. You must file and serve your response within 21 days of the date this was served on you. Your response must state why the motion should not be granted. If you do not file a timely response, the relief may be granted without further notice to you. If you oppose the motion and have not reached an agreement, you must attend the hearing. Unless the parties agree otherwise, the court may consider evidence at the hearing and may decide the motion at the hearing.**
>
> **Represented parties should act through their attorney.**
>
> **There will be a hearing on this motion on March 18, 2025, at 11:00 a.m. in Courtroom 403, 515 Rusk Street, Houston, TX 77002.**
>
> **The deadline for filing a response as well as the hearing date on this motion may be modified by order of the Court.**

TO THE HON. JEFFREY NORMAN, UNITED STATES BANKRUPTCY JUDGE:

National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), Houston 2425 Galleria, LLC ("Houston 2425"), and Christopher R. Murray, Liquidation Trustee (the "Liquidation Trustee") submit this *Joint Motion to Convert Case[1] to Chapter 7* (the "Motion"). In support,

---

[1] "Case" refers to Case No. 24-35761, initiated against debtor Jetall Companies, Inc. ("Jetall Companies" or the "Debtor") by an involuntary petition (the "Involuntary") filed by putative creditors M. Nasr & Partners, PC
( . . . footnote continued on following page . . . )

NBK, Huston 2425, and the Liquidation Trustee submit the *Declaration of Charles C. Conrad* (the "Conrad Dec.") as **Exhibit A** and represent as follows:

<u>PRELIMINARY STATEMENT</u>

1.      Chapter 7 conversion is warranted because this case was filed in bad faith, the cause factors for conversion are met, and the best interests of creditors will be served by the immediate appointment of a chapter 7 trustee to manage the estate's affairs.

2.      The Debtor is owned and controlled by a single individual who is a serial filer that misuses the legal system to delay and frustrate his entities' legitimate creditors and who is hopelessly conflicted and entirely unable to fulfill the Debtor's fiduciary obligations.  This Court has already witnessed the Debtor's principal repeatedly putting forth an individual without any real knowledge of the Debtor as its representative as a shill to shield himself from answering questions and being held accountable as the Debtor's control person.[2]  This Court has already determined that the Debtor's principal is conflicted and unable to act in his entities' or their creditors', rather than his own, best interests.[3]  And this Court has already found that the Debtor's principal has lied to it in other matters, including in filing a fraudulent claim on behalf of a Debtor

---

("Nasr"), EAO Global LLC d/b/a PopLabs ("EAO Global"), and Ron Madriz (collectively, the "Petitioning Creditors").  Unless otherwise noted, all "Case No." references are to proceedings in the Bankruptcy Court for the Southern District of Texas.  All "ECF No." references without a Case No. reference are to the docket in this proceeding.

[2] Conrad Dec., ¶ 4, Ex. 1 [*Transcript of January 31, 2024, Hearing in Galleria II*], at 86 ("THE COURT: . . . Mr. Darjean is not a very believable witness.  He knows as little, as much – I mean, his lack of knowledge is to this point somewhat appalling."); Case No. 23-34815, ECF No. 995 ("The second witness, Dward Darjean appeared pursuant to the Court's order requiring a representative to appear for Jetall Companies, Inc. [and] Jetall Capital, LLC . . . .  His lack of actual knowledge regarding the facts of this case both in January of 2024 and as of the date of this hearing is astonishing.").

[3] Conrad Dec., ¶ 4, Ex. 1 [*Transcript of January 31, 2024, Hearing in Galleria II*], at 223-224; Case No. 23-34815, ECF No. 99; *Id.*, ECF No. 780.

4911-9170-8700.v7

affiliate.[4]  Neither the Court nor the Debtor's creditors can put any faith into the Debtor's ability to successfully rehabilitate or reorganize under chapter 11.

3.      Beyond that, there are no indications that this case was filed in good faith or for a legitimate purpose.  Rather, this case has all the markers of being brought to achieve an improper purpose and to delay creditors through manipulation of the bankruptcy laws.  The Debtor has already failed to comply with statutory disclosure requirements and this Court's orders.  The Debtor has no reasonable prospect of reorganization because it lacks the ability and desire to pay any of its non-insider creditors and because there are few, if any, liquid assets available for distribution.  In short, the Debtor cannot be left to manage its own affairs, and there is no demonstrable business to reorganize.

4.      Under these circumstances, chapter 7 liquidation is warranted and is the best option available for creditors.  A chapter 7 trustee is needed because management has proven that it cannot, or will not, operate the Debtor in a way that maximizes, or even preserves value.  A chapter 11 trustee would add unnecessary expense to the liquidation process.  And dismissal would only serve to reward the Debtor and its owner for the continued use of the bankruptcy courts as a bludgeon against their ever-growing list of creditors and trail of vexatious litigation.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter under 28 U.S.C. §§ 157(b)(2) and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28

---

[4] Case No. 23-34815, ECF No. 717 ("This Court now has a long history with Ali Choudhri.  This Court has held that his truth and veracity are questionable in prior proceedings in this case.  The Court after hearing finds again that his truth and veracity are questionable, unfortunately entirely questionable.  He did not appear for this hearing, claiming again, falsely, that he was ill.  The Court understands his failure to appear, as the only witness before the Court testified that Choudhri was of questionable conduct and created false documents.  There are questions that Choudhri does not want to answer and if he had appeared, the Court would have forced him to answer them.  The Court believes that Choudhri is a forger and a liar, but he at least is smart enough to avoid a Court hearing where he would be forced to testify and face what is now very evident to this Court.").

U.S.C. § 157(b)(2) and the Court has authority to enter a final order granting the relief requested. The bases for the relief requested are section 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), Rule 1017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas.

## RELIEF REQUESTED

6.      NBK, Houston 2425, and the Liquidation Trustee seek entry of an order in the form attached as **Exhibit B** (the "Proposed Order") converting this chapter 11 case to a case under chapter 7.

## FACTUAL BACKGROUND

### A.     Affiliated Bankruptcy Cases

7.      Ali Choudhri ("Mr. Choudhri") is the president and director of the Debtor, the sole member and director of Jetall Capital, Inc. ("Jetall Capital"), and the managing member (and the ultimate sole owner) of Galleria 2425 Owner, LLC ("Galleria 2425") and 2425 WL, LLC ("2425 WL"), among other entities.  Mr. Choudhri's entities have a long history of using the bankruptcy courts (and other courts) to avoid or delay paying creditors.  A brief recitation of some of the parties' history and some of the Choudhri-entities' prior cases is necessary context to this Motion.

8.      On May 23, 2018, NBK loaned Galleria 2425 approximately $52 million (the "Loan") to purchase real property including an office building located at 2425 West Loop South, Houston, Texas 77027 (the "Property").  Beginning in April 2020, Galleria 2425 defaulted on the Loan, and notices of default were issued.

9.      On July 5, 2023, minutes before a public foreclosure auction was set to begin, Mr. Choudhri caused Galleria 2425 to file a voluntary chapter 11 petition ("*Galleria I*") in the United

States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>").[5]  On November 1, 2023, Judge Christopher Lopez *sua sponte* dismissed *Galleria I*, finding no reasonable likelihood that the debtor could propose a confirmable chapter 11 plan.[6]  NBK again prepared to foreclose on the next available date under Texas law, December 5, 2023.

10.     Just minutes before that foreclosure auction was set to begin, Mr. Choudhri caused Galleria 2425 to file a second voluntary chapter 11 petition ("<u>*Galleria II*</u>").  On January 31, 2024, this Court ordered the appointment of a chapter 11 trustee (the "<u>Chapter 11 Trustee</u>") in *Galleria II* due to inescapable conflicts between Galleria 2425, the Debtor, 2425 WL, and Mr. Choudhri.[7]  The debtor's counsel's fee application was later denied because counsel "crossed a very thin line and in effect began to represent interests adverse to the estate," including the Debtor's interests.[8]  Galleria 2425 never proposed a confirmable chapter 11 plan, and, on June 22, 2024, this Court confirmed NBK's chapter 11 plan of liquidation of Galleria 2425 (the "<u>Plan</u>").

11.     On July 8, 2024, this Court authorized the Chapter 11 Trustee to sell Galleria 2425's real property (the "<u>Property</u>") free and clear of all liens, claims, encumbrances, and other interests—including the Debtor's office lease—to QB Loop Property LP ("<u>QB Loop</u>"), another entity affiliated with Mr. Choudhri, and if QB Loop failed to close, to NBK as the backup bidder.[9]  On August 9, 2024, QB Loop failed to close.[10]  On August 20, 2024, the Chapter 11 Trustee sold the Property to NBK's assignee and designee, Houston 2425 Galleria, LLC ("<u>Houston 2425</u>"), free

---

[5] Case No. 23-60036, ECF No. 1.

[6] Case No. 23-60036, ECF No. 105.

[7] Case No. 23-34815, ECF No. 99.

[8] Case No. 23-34815, ECF No. 780.

[9] Case No. 23-34815, ECF No. 608 (the "<u>Sale Order</u>").

[10] Case No. 23-34815, ECF No. 658.

4911-9170-8700.v7

and clear of, among other things, the Debtor's lease.[11]  The Debtor's lease was not assumed by Houston 2425.

12.     NBK's *Galleria II* Plan went effective on August 21, 2024, and the Chapter 11 Trustee now serves as the Liquidation Trustee.  The Debtor and Jetall Capital both asserted claims in *Galleria II*.  The Debtor's $3,180,233.30 claim was purportedly based on loans and unpaid management, commission, and placement fees.[12]  Jetall Capital did not state a basis for its collective $3,399,500 claims, but would later assert they were for "the balance due on Tenant Improvement Allowance," "reimbursement of payroll advances and other expenses of Galleria 2425," and "unpaid lease commissions and management fees."[13]  The Debtor's claim is contested and subject to disallowance, pending the outcome of an adversary proceeding brought against the Debtor by the Chapter 11 Trustee.[14]  Jetall Capital's claims were disallowed in their entirety after objection by the Chapter 11 Trustee.[15]  Another Choudhri-owned affiliate, 2425 WL asserted a fraudulent claim, signed by Mr. Choudhri, which the Court rejected and referred to the United States Attorney for investigation.[16]

---

[11] Case No. 23-34815, ECF No. 675.

[12] Case No. 23-34815, Claim No. 20.

[13] Case No. 23-34815, Claim Nos. 23 & 24; Case No. 23-34185, ECF No. 593.

[14] Case No. 24-03117, ECF No. 1.

[15] Case No. 23-34815, ECF Nos. 404 & 709.  Jetall **Capital** also asked that the Trustee's claim objection be consolidated with a then-pending adversary proceeding styled *Murray v. Jetall **Companies**, Inc.*, Adv. No. 24-03117 (Bankr. S.D. Tex.).  The blurred line between Jetall Capital and the Debtor is problematic.

[16] Case No. 23-34815, ECF No. 717.

### B.    The Debtor's Involuntary Proceeding

13.    The Sale Order required the Debtor to vacate the Property.  It refused.  Houston 2425 filed a motion seeking to enforce the relevant provisions of the Sale Order,[17] which the Court set for hearing on December 5, 2024.

14.    At 9:12 p.m. the night before that hearing was set to begin, a single petitioning creditor—EAO Global, purportedly acting *pro se*[18]—filed an involuntary chapter 11 petition in the United States Bankruptcy Court for the Western District of Texas (the "Involuntary"),[19] commencing the Involuntary and creating Jetall Companies, Inc.'s chapter 11 estate (the "Estate"). The petitioning creditor listed the Debtor's principal place of business as 13498 Pond Springs Road, Austin, Texas 78729[20] even though numerous other filings, including the Debtor's own filings in Galleria 2425's bankruptcy cases, listed its address as 1001 West Loop South, Suite 700, Houston, Texas 77027.  There has never been any explanation by the original petitioning creditor about its motivation for, and the timing of, the filing of the Involuntary or why it was commenced in the Western District rather than the Southern District.

15.    On December 6, 2024, the Involuntary was transferred to this Court.[21]  Shortly after, this Court entered its *Order Annulling the Automatic Stay*,[22] based on the findings in its *Memorandum Opinion*,[23] describing the Involuntary as "suspect" and noting the Involuntary "was

---

[17] Case No. 23-34815, ECF No. 838 (the "Enforcement Motion").

[18] It is well established that corporate entities cannot act *pro se*.  *See, e.g.*, *Memon v. Allied Domecq QSR*, 385 F.3d 871, 873 (5th Cir. 2004) (discussing "the well-settled rule of law that a corporation cannot appear in federal court unless represented by a licensed attorney").

[19] Western District Bankruptcy Case No. 24-11544.

[20] ECF No. 1.

[21] ECF No. 2.

[22] ECF No. 4.

[23] Case No. 23-34815, ECF No. 870.

4911-9170-8700.v7

filed less than 12 hours prior to the scheduled hearing" on the Enforcement Motion.  This Court granted the Enforcement Motion in *Galleria II* and ordered the Debtor to vacate the Property by December 13, 2024 (the "Enforcement Order").[24]

16.    On December 10, 2024, the Debtor appealed the Enforcement Order.[25]  On December 11, 2024, this Court and the United States District Court for the Southern District of Texas denied the Debtor's motions for a stay of the Enforcement Order pending appeal.[26]  On December 18, 2024, the United States Court of Appeals for the Fifth Circuit denied the Debtor's emergency motion for a stay of the Enforcement Order pending appeal.[27]  On December 24, 2024, the U.S. Marshal Service implemented the Enforcement Order, and the Debtor was removed from the Property.

17.    After the Debtor's stay requests were denied and the Enforcement Order was implemented, the involuntary petition was amended and supplemented to change the Debtor's principal place of business to 1001 West Loop South, Suite 700, Houston, Texas 77027 and add a second and third petitioning creditor.[28]  The Debtor, not the Petitioning Creditors, requested reconsideration of the annulment of the automatic stay,[29] confirming the Debtor's goal of being

---

[24] Case No. 23-34815, ECF No. 871.

[25] Case No. 23-34815, ECF No. 887.

[26] Case No. 23-34815, ECF No. 897; Case No. 4:24-cv-04835, minute entry order on December 11, 2024.

[27] Case No. 24-20552, ECF No. 26.

[28] ECF Nos. 6, 16.  The total amount claimed by Petitioning Creditors is currently $505,156.79.  Petitioning Creditor EAO Global LLC claims $99,994.79 is owed for consulting services.  Petitioning Creditor M. Nasr & Partners, PC claims $401,562 is owed for consulting services.  Petitioning Creditor Ron Madriz claims $3,600 is owed for web development and information technology services.

[29] ECF Nos. 14, 15.

protected by the stay through the Involuntary.  The reconsideration motion was denied,[30] and the Debtor appealed the annulment.[31]

18.     Since the Involuntary was filed, non-petitioning creditors, such as AMEX TRS Co., Inc., Harris County, *et al.*, and the Liquidation Trustee have filed proofs of claims totaling $3,530,092.22.[32]  The full scope of the pool of claims against the Debtor is unknown at this stage. However, NBK and Houston 2425 also have claims against the Estate for, among other things, failure to pay for use and occupancy before being compelled to vacate the Property and sanctions as ordered by this Court on February 12, 2025.[33]

19.     On January 9, 2025, the three Petitioning Creditors moved to dismiss the Involuntary and, though not required under 11 U.S.C. § 303 or any other section of the Bankruptcy Code, averred:

> In connection with this Motion to Dismiss, each of the Petitioning Creditors aver that: (1) they received nothing, including a promise of future consideration, in return from the Alleged Debtor in return for filing the Involuntary Petition and commencing this Involuntary Bankruptcy Case; and (2) they received nothing, including a promise of future consideration, in return from the Alleged Debtor in return for filing this Motion to Dismiss.[34]

20.     The Motion to Dismiss was devoid of any reason explaining why the Petitioning Creditors filed the Involuntary in the first place or why they decided to move for its dismissal.  The Debtor was not a moving party, although it did acknowledge that, if the Involuntary were

---

[30] ECF No. 18.

[31] ECF No. 22.

[32] Claim Nos. 1-3.

[33] Case No. 23-34815, ECF No. 995.

[34] ECF No. 24, ¶ 4 (the "Motion to Dismiss").

4911-9170-8700.v7

dismissed, it would not pursue claims against the Petitioning Creditors under section 303 of the Bankruptcy Code.[35]

21.     NBK, Houston 2425, the Liquidation Trustee, and Sonder USA, Inc. ("Sonder") opposed the Motion to Dismiss.[36]  The Petitioning Creditors filed a pre-trial submission, updating the chronology of the Involuntary, including that the Debtor had failed to timely respond to the Involuntary petition and indicating that this failure required that an order for relief be entered against the Debtor.[37]  On February 7, 2025, this Court denied the Motion to Dismiss.[38]  In doing so, this Court specifically stated that it "believes that further investigation is in the best interest of the creditors due to the allegations set forth in the objections and the Court's own experiences with the parties."[39]  This Court went on to note that "it found that [the Involuntary] was suspect, and filed in bad faith."[40]  For those reasons and others, this Court entered an Order for Relief and set a February 14, 2025, deadline to file schedules and other required documents under Bankruptcy Rule 1007(a)(2) and a February 21, 2025, deadline to file all other documents required by 11 U.S.C. § 521 and Bankruptcy Rule 1007.[41]  The Debtor did not comply with either deadline.  None of the documents required by Bankruptcy Rule 1007 or § 521 have been filed.

22.     On February 10, 2025, this Court entered its *Order to Debtor in Possession*, requiring the Debtor to, among other things, close all bank accounts and open DIP accounts, close and preserve its prepetition books and maintain new post-petition books, refrain from paying any

---

[35] *Id.*

[36] ECF Nos. 26, 30 & 38.

[37] ECF No. 37.

[38] ECF No. 39.

[39] *Id.*

[40] *Id.*

[41] *Id.*

4911-9170-8700.v7

prepetition debts, refrain from using any cash collateral, and refrain from selling, leasing, or otherwise disposing of property or entering into transactions outside the ordinary course of business.[42]  It is unclear, but unlikely, the Debtor has complied with this order.  This Court also set a June 10, 2025, deadline for the Debtor to file its plan and disclosure statement.[43]

23.     On February 12, 2025, in *Galleria II*, this Court found the Debtor, Jetall Capital, and their counsel in contempt of the Sale Order.[44]  It described a "blatant disregard" for its prior orders and, as a result, ordered the Debtor, among others, to pay $25,000 to the Court and ordered the Debtor, Jetall Capital, 2425 WL, and their counsel to pay $25,000 to NBK.[45]

24.     On February 21, 2025, the Debtor filed a Notice of Appeal of the Court's order denying the Motion to Dismiss, which set document filing deadlines for the Debtor in this case.[46] The Debtor did not request, nor did it receive, a stay of the order setting the document filing deadlines or an extension of those deadlines.  The Debtor, thus, was required to comply, and its filing of the Notice of Appeal and refusing to comply reflects a pattern of the Debtor, Mr. Choudhri, and affiliates ignoring unstayed orders of this Court.  Of course, as noted above, the Petitioning Creditors, not the Debtor, filed the Motion to Dismiss the Involuntary, and the Debtor never responded to the Involuntary, precluding it from appealing the denial of the Motion to Dismiss—an issue that will be addressed separately in due course.

---

[42] ECF No. 42.

[43] *Id.*

[44] Case 23-34815, ECF No. 995.

[45] *Id.*

[46] ECF No. 47.

4911-9170-8700.v7

C.      **The Debtor and Jetall Capital**

25.      It is unclear what, exactly the Debtor does or how it makes money.  Mr. Choudhri

has previously represented that the Debtor is a property management and leasing company that

oversees or operates his real estate portfolio (with the various properties themselves being owned

by different, Choudhri-owned entities).[47]  As explained by Mr. Choudhri, the Debtor "buys, sells,

manages, [and] develops leases of real estate."[48]  This, generally, accords with what the Debtor

has represented in various places online, for example:

> Jetall Companies is a family-owned real estate investment and management firm,
> which through its principals, commenced operations in 1961 in London, England.
> Through the leadership of Ali Choudhri, Jetall has become the largest private owner
> of commercial office space in Houston's Galleria submarket, managing over 1
> million square feet of property space.  Jetall is also an acquirer and developer of
> mixed-use, residential, and multi-family properties and, through Jetall Capital,
> handles Debt Restructuring, Work-Outs, and Start-Up growth investments.[49]

26.      On paper, the Debtor purports to derive income by charging management fees or

leasing commissions for the properties it "operates."[50]  However, at least as to the Property, the

Debtor collected little if anything while, supposedly, deferring or failing to collect several millions

of dollars for management and leasing fees and advancing several hundred thousand dollars for

renovation, maintenance, and upkeep.[51]  This conundrum appears to be commonplace for

properties the Debtor claims to operate.[52]

---

[47] Conrad Dec., ¶ 5, Ex. 2 [*Transcript of September 22, 2023, Hearing in Galleria I*], at 21.

[48] *Id.*, at 29.

[49] *See, e.g.,* https://jetallcapital.com/jetall-companies-announces-co-working-space-galloworks-as-new-tenant-in-im-pei-designed-2425-w-loop-south-building.

[50] Conrad Dec., ¶ 5, Ex. 2 [*Transcript of September 22, 2023, Hearing in Galleria I*] at 40-41.

[51] *Id.*; Case No. 23-34815, Claim Nos. 20, 23 & 24.  All these are disputed; two have already been rejected by this Court.  *Id.*, ECF No. 709.

[52] *See, e.g.*, Case No. 24-32143; *In re 1001 WL, LLC*, Case No. 24-10119 (Bankr. W.D. Tex.).

27.     In reality, it appears that Mr. Choudhri uses the Debtor only as a pass-through piggy bank for his other entities, a liability shield, and a litigation vehicle.  Mr. Choudhri admitted that he used the Debtor to pay for Galleria 2425's negative cash flow—*i.e.*, Mr. Choudhri funded one of his entity's expenses with another of his entity's cash.[53]  Mr. Choudhri even promised to use the Debtor to fund any deficiencies that may exist with the putative plan of reorganization in *Galleria I*, to fund any DIP loan required in *Galleria I*, and to fund any monies that might be needed to get to confirmation in *Galleria I*.[54]  Mr. Choudhri has also used the Debtor as a litigation tool to file what this Court has deemed "vexatious"[55] (and often frivolous) lawsuits seeking to stop or delay the inevitable sale of the Property.[56]

28.     It is also unclear whether the Debtor exists as its own separate entity or whether Mr. Choudhri has transferred or commingled its assets and operations with another of his entities, Jetall Capital.  The Debtor and Jetall Capital, which was formed on February 9, 2023, share an office at 1001 West Loop South, Suite 700, Houston, Texas 77027.  When one tries to access the Debtor's website at www.jetallcompanies.com, one is automatically redirected to Jetall Capital's website at www.jetallcapital.com.

29.     The Jetall Capital website contains a designation of "Copyright © 2023 Jetall Capital, Inc.," which appears to be a conflation of Jetall Companies, Inc. and Jetall Capital, LLC.  The contact email address provided on the website still uses an "@jetallcompanies.com" email domain.   The URL for the website was previously jetallcompanies.com.[57]   As recently as

---

[53] Conrad Dec., ¶ 5, Ex. 2 [*Transcript of September 22, 2023, Hearing in Galleria I*] at 40-41, 61-62.

[54] *Id.*, at 61-62.

[55] ECF No. 39.

[56] *See, e.g.*, *Jetall Companies, Inc. v. Jackson Walker LLP et al.*, Adv. No. 24-03257; *Jetall Companies, Inc. v. Jackson Walker LLP et al.*, Adv. No. 25-03016

[57] https://web.archive.org/web/*/jetallcompanies.com/*.

4911-9170-8700.v7

December 4, 2022, the homepage for the website referred to the Debtor rather than Jetall Capital, as shown in the following screenshot.[58]



30.     Jetall Capital's website lists eleven properties on its "Properties" page.[59]  There is a hyperlinked photograph with a Jetall Capital logo for each property.  The hyperlinks direct traffic to individual pages for each property that provide a property overview, property facts, and additional photos.  Jetall Capital's name is again listed at the top of each property page.  The list of properties includes properties known or believed to be owned by others.  For example, one of the "Properties" is the property located at 2425 West Loop South, Houston, Texas (the Property sold pursuant to the Sale Order),[60] where Jetall Capital states it has space to lease.

<u>**ARGUMENT AND AUTHORITIES**</u>

**A.     Legal Standards**

31.     Section 1112(b)(1) provides, in relevant part:

[O]n request of a party in interest, and after notice and a hearing, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . .

---

[58] https://web.archive.org/web/20221204154518/https://jetallcompanies.com/.

[59] https://jetallcapital.com/properties/.

[60] https://jetallcapital.com/property-item/2425-west-loop-south.

4911-9170-8700.v7

11 U.S.C. § 1112(b)(1) (emphasis added).[61]

32.     "Cause" is undefined by the Bankruptcy Code, but section 1112(b)(4) provides a list of 16 nonexclusive examples, including: (i) "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"; "gross mismanagement of the estate"; "failure to comply with an order of the court"; "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter"; and "inability to effectuate substantial consummation of a confirmed plan." 11 U.S.C. § 1112(b)(4)(A), (B), (E), (F), (M). The presence of any one of these factors warrants conversion to prevent a debtor "from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004) (quotation omitted).

33.     In addition, courts are required to consider whether the case was filed in bad faith. *In re Yukos Oil Co.*, 321 B.R. 396, 410 (Bankr. S.D. Tex. 2005) (Courts "are required to consider the debtor's good faith, which depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities."); *In re Elmwood Dev. Co.*, 964 F.2d 508, 510 (5th Cir. 1992); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986) ("Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings.").

---

[61] As the Supreme Court has stated, "the mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998); *see also In re Riverbend Cmty., LLC*, Case No. 11-11771, 2012 WL 1030340, at *3 n.6 (Bankr. D. Del. Mar. 23, 2012) ("Congressional intent that 'shall' really does mean 'must' in the convert or dismiss provision is readily apparent. In 2005, Congress removed the word 'may' from Section 1112(b) and substituted 'shall' if a moving party establishes 'cause.' Congress clearly intended to make conversion or dismissal mandatory upon proof of 'cause.'") (internal citation omitted); 7 Collier on Bankruptcy ¶ 112.04[4] (16th ed. 2023) ("If cause is established and unusual circumstances are not found by the court, the statute requires conversion to chapter 7").

4911-9170-8700.v7

34. At bottom, the court's determination of "cause" turns on the totality of the circumstances of the case before it. *In re Turkey Leg Hut & Co. LLC*, 665 B.R. 129, 138 (Bankr. S.D. Tex. 2024) (citing *In re T-H New Orleans, L.P.*, 116 F.3d 790, 802 (5th Cir. 1997) and *In re Timbers of Inwood Forest Assocs, Ltd.*, 808 F.2d 363, 371-72 (5th Cir. 1987)). The Court has broad discretion in determining "cause" under § 1112(b), and its determination will only be disturbed for an abuse of discretion. *See Matter of Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991).

**B.     Cause to Convert Exists Because This Case Was Not Filed in Good Faith**

35. "The good faith standard protects the integrity of the bankruptcy courts and prohibits a debtor's misuse of the process where the overriding motive is to delay creditors without any possible benefit, or to achieve a reprehensible purpose through manipulation of the bankruptcy laws." *In re Elmwood*, 964 F.2d at 510. Lack of good faith findings are typically "predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than any single datum." *In re Little Creek Dev. Co.*, 779 F.2d at 1071-72.

36. "Bad faith conduct can include prepetition bad-faith conduct, post-petition bad faith conduct, or petitions that serve no legitimate bankruptcy purpose." *In re M.A.R. Designs & Constr., Inc.* 653 B.R. 843, 865 (Bankr. S.D. Tex. 2023) (citation omitted). Among other indices, courts have found bad faith where the debtor has engaged in improper prepetition conduct, when the debtor employs few or zero employees other than its principals, and when there is little or no cash flow or source of income to sustain a reorganization. *Id.* (citation omitted). "The analysis permits a bankruptcy court to 'dispense with futile procedural niceties in order to reach more expeditiously an end result required by the Code.'" *In re Zamora-Quezada*, 622 B.R. 865, 882 (Bankr. S.D. Tex. 2017) (quoting *Law v. Siegel*, 571 U.S. 415, 426 (2014)).

4911-9170-8700.v7

37.     All the hallmarks of a lack of good faith are present here.  This Court has already determined the Involuntary is "suspect" and found cause to annul the automatic stay "given the timing of the [I]nvoluntary filing and the Court's finding that the principal is a vexatious litigant."[62] The facts underlying those concerns, and others, also support a bad faith cause finding under § 1112(b).

38.     First, the initiation of this case indicates bad faith.   The Involuntary was commenced by a single "*pro se*" creditor at 9:12 p.m. on the evening before a hearing on NBK's motion to enforce the Sale Order to compel the Debtor to vacate the Property.  The representative of the petitioning creditor was also the signatory to a frivolous *lis pendens* filed on behalf of the Debtor in December 2024—after the Involuntary was filed—so it appears that the representative of the petitioning creditor may represent the Debtor or at least work in close cooperation with the Debtor.[63]  The Involuntary was filed in the Western District, rather than the Southern District, despite the fact that the Debtor is headquartered in the Southern District and the petitioning creditor listed a Southern District address for itself.  The petitioning creditor has yet to explain why it filed the Involuntary, the timing of its filing, or the decision to file in Austin (*i.e.*, beyond the purview of this Court, which was overseeing *Galleria II*).  The obvious answers to these questions signal bad faith.

39.     Second, the post-filing history of this case raises additional doubts as to its good faith.  After the petition was amended to add additional creditors, all three moved to dismiss the case without offering any justification for either the Involuntary's initiation or the Petitioning

---

[62] ECF No. 18.

[63] Press releases issued by the Debtor's counsel also list Mr. McCubbin as an official contact for the Debtor.  *See* https://usinsider.com/macgeorge-law-firm-wins-4-5-million-judgment-for-client-jetall-companies-and-ali-choudhri/.

4911-9170-8700.v7

Creditors' sudden change of heart.[64]  The dismissal motion came only after this Court annulled the stay, which curiously only the Debtor (not the Petitioning Creditors) appealed, and made clear that it would not allow the Involuntary to prevent the Debtor's ouster from the Property.  Just before the hearing on the dismissal motion, the Petitioning Creditors asked the Court to enter an order for relief, which would continue rather than end this case, but in a way that would avoid inquiry into their intent, motivation, or knowledge.[65]  It is unclear what the Petitioning Creditors' relationship with the Debtor is, but their ephemeral desires—first to prosecute, then to dismiss possibly indicate additional lack of good faith.

40.    Moreover, only the Debtor and not the Petitioning Creditors have appealed the decision denying the Petitioning Creditors' dismissal motion.  Doing so, while at the same time seeking to reinstate the benefits of the automatic stay through the appeal of the Court's order annulling the stay, indicates misuse of the bankruptcy system and underscores the lack of good faith here.

41.    Third, the Debtor's improper prepetition conduct suggests bad faith.  Among other examples, set forth in more detail below, these include violating several orders of this Court, including, but not limited to, the Sale Order, the order to vacate the Property, the order canceling *lis pendens* and to not interfere with NBK's or Houston 2425's use and enjoyment of the Property, filing frivolous lawsuits seeking to enjoin or delay its ouster from the Property, and filing frivolous *lis pendens* seeking to disrupt the eventual sale of the Property.  None of that can be described as being done in good faith or for a proper purpose.

---

[64] ECF No. 24.

[65] ECF No. 37.

4911-9170-8700.v7

42.     Fourth, the Debtor has few employees, and likely none that a chapter 11 reorganization can protect.  NBK, Houston 2425, and the Court are aware that the Debtor employs in-house counsel (Mr. Rayome), a property manager (Mr. Darjean), and a bookkeeper (Ms. MacGeorge).  To the extent the Debtor, at some point, employed additional people to service the Property, their jobs cannot be saved by reorganization.  The Property has been sold, and the Debtor has been removed as manager.  There is now nothing for those individuals to do and their continued employment would only serve to increase Estate expenses unnecessarily.  This same scenario is likely also true for other properties the Debtor claims to manage, which themselves are subject to ongoing legal battles that may likely also result in the Debtor's removal.[66]  This too suggests bad faith.

43.     Fifth, and although somewhat unclear, it does not appear that the Debtor has any (let alone positive) cash flow or source of income to sustain a reorganization.  As discussed above, the Debtor is apparently in the business of managing Mr. Choudhri's real estate portfolio.  Looking only at the Property, it is evident that the Debtor does not have a sustainable, cash-generating operation.  While operating the Property, the Debtor says it "advanced," "lent," or generated "commissions" of approximately $3.2 million to Galleria 2425.[67]  The Debtor claims it was never repaid or compensated for those services.  The Court and the Debtor's creditors are left to wonder how it has a sustainable business operation—one worth rehabilitating—if its primary revenue generating property owes it $3.2 million (and that claim is disputed and unlikely to be paid).[68]  The situation only gets worse, understanding that several additional properties the Debtor claims to

---

[66] See, e.g., Case No. 24-32143 (50 Briar Hollow property); In re 1001 WL, LLC, Case No. 24-10119 (Bankr. W.D. Tex.) (1001 West Loop property).

[67] Case No. 23-34815, Claim No. 20.  This is in addition to the $3.4 million the Debtor's affiliate, Jetall Capital, asserts it is owed for these same types of "loans" or "services."

[68] Case No. 23-34815, ECF No. 404.

operate are currently involved in bankruptcy proceedings, possibly leading to the Debtor's separation from them as well.[69]  The Debtor's lack of any cash flow or source of income to sustain a reorganization demonstrates bad faith.

44.     Finally, there should be little doubt that the Debtor has no interest in pursuing potentially valuable claims against insiders or affiliates.  Mr. Choudhri has admitted that he caused the Debtor to make transfers, advances, or "loans" to other entities he owns or controls, including Galleria 2425.[70]  He has also admitted that he was on both sides of these transactions.[71]  That, necessarily, raises the question of whether the transfers are subject to avoidance or claw back under chapter 5.  The Court can readily infer that Mr. Choudhri, on behalf of the Debtor, will decline to investigate or pursue claims against Mr. Choudhri, on behalf of himself or the other entities he owns or controls.  In fact, the Court has already made that determination in *Galleria II*, appointing a chapter 11 trustee because of an inescapable conflict between Mr. Choudhri and his entities and denying that debtor's counsel's fee application for representing interests adverse to the *Galleria II* estate, including the Debtor's.[72]  Again, this shows bad faith.

45.     Given the totality of the circumstances here, including the suspect timing of the Involuntary, the suspect venue of the Involuntary, the unexplained (and oft changing) motivations of the Petitioning Creditors, the Debtor's own efforts to wield the case as a litigation tool, and the Debtor's lack of any meaningful reorganization prospects, the Court should exercise its broad discretion to find cause for conversion under § 1112(b)'s good faith requirement.

---

[69] *See, e.g.*, Case No. 24-32143 (50 Briar Hollow property); *In re 1001 WL, LLC*, Case No. 24-10119 (Bankr. W.D. Tex.) (1001 West Loop property).

[70] Case No. 23-34815, Claim Nos. 20, 23 & 24. Conrad Dec., ¶ 5, Ex. 2 [*Transcript of September 22, 2023, Hearing in Galleria I*] at 73-75.

[71] Conrad Dec., ¶ 5, Ex. 2 [*Transcript of September 22, 2023, Hearing in Galleria I*] at 73-75.

[72] Case no. 23-34815, ECF Nos. 99 & 790.

**C.      Cause Exists Under Several of 11 U.S.C. § 1112(b)(4)'s Enumerated Factors**

46.      Alternatively, the Court should convert this case because cause exists to do so under, at least, Bankruptcy Code sections 1112(b)(4)(A)(B), (E), (F), and (M).

        1.      <u>Cause exists under 11 U.S.C. § 1112(b)(4)(E) and (F) for failure to comply with this Court's orders and for failure to file schedules as required by Bankruptcy Rule 1007(a)(2).</u>

47.      "Timely and accurate financial disclosure is the life blood of the Chapter 11 process." *Matter of Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991).  And "[n]either the court nor creditors should have to coerce or implore a debtor into fulfilling the obligations imposed on it." *Id.*  For those reasons, section 1112(b) expressly provides that cause to convert includes an "unexcused failure to satisfy timely any filing or reporting requirement established by [chapter 11] or by any rule applicable to a case under [chapter 11]."  11 U.S.C. § 1112(b)(4)(F).

48.      Further, cause to convert includes any "failure to comply with an order of the court." *Id.*, § 1112(b)(4)(E).  This is because "[a] debtor has the obligation to strictly abide by the bankruptcy court's orders." *In re Turkey Leg Hut & Co. LLC*, 665 B.R. at 140 (citation omitted).  And "[c]ause to convert pursuant to § 1112(B)(4)(E) exists if a debtor fails to comply with a single order; a pattern of non-compliance is not required by the statute," nor does section 1112(b) "require a debtor's non-compliance to be willful, in bad faith, or fraudulent." *Id.* (citation omitted).

49.      On February 7, 2025, this Court entered an Order for Relief against the Debtor.[73] That triggered Bankruptcy Rule 1007(a)(2)'s seven-day period to file "a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H as prescribed by the Official Forms." FED. R. BANKR. P. 1007(a)(2).  It also triggered Bankruptcy Rule 1007(c)'s 14-day period to file "the schedules, statements, and other documents required by subdivision

---

[73] ECF No. 39.

4911-9170-8700.v7

(b)(1)," including schedules of assets and liabilities, current income and expenditures, executory contracts and unexpired leases, and a statement of financial affairs. FED. R. BANKR. P. 1007(c). Beyond Bankruptcy Rule 1007's mandates, this Court specifically ordered the Debtor to "file schedules and other required documents under Federal Rule of Bankruptcy Procedure 1007(a)(2)" by February 14, 2025, and to file "[a]ll other documents required by 11 U.S.C. § 521, and Federal Rule of Bankruptcy Procedure 1007" by February 21, 2025.[74]

50.     The Debtor failed to file the information required by Bankruptcy Rule 1007(a)(2) and this Court's order by the February 14, 2025, deadline. The Debtor also failed to file the information required by Bankruptcy Rule 1007(b), § 521, and this Court's order by the February 21, 2025, deadline. Indeed, the Debtor still has not complied. The Debtor has no excuse for its failure to file the Bankruptcy Rule 1007(a)(2) statement, the Bankruptcy Rule 1007(b) schedules and statement of financial affairs, and the filings required by § 521 nor for its contempt of this Court's February 14, 2025, order. Its appeal of the Court's order does not relieve the Debtor of its obligation to comply with the Bankruptcy Code and Rules or this Court's unstayed order. Significantly, this is not the first court order the Debtor has knowingly and willfully violated.[75]

51.     The Debtor's failure to file the information required by Bankruptcy Rule 1007(a)(2), Bankruptcy Rule 1007(b), and § 521, and its disobedience of this Court's February 7, 2025, order constitute cause under section 1112(b)(4)(E) and (F) to convert this case.

        2.      <u>Cause exists under 11 U.S.C. § 1112(b)(4)(B) based on gross mismanagement.</u>

52.     Section 1112(b)(4)(B) provides that cause exists to convert for "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4)(B). "A debtor in possession is vested with

---

[74] *Id.*

[75] *See, e.g.*, Case No. 23-34815, ECF No. 995.

4911-9170-8700.v7

significant power under the Bankruptcy Code and that power comes with certain responsibilities."

*In re Turkey Leg Hut & Co. LLC*, 665 B.R. at 140 (citation omitted).  "A debtor in possession owes

a fiduciary duty to its creditors" and "[g]ross mismanagement is a breach of that duty."  *Id.*

(citations omitted).  "Simple mismanagement is insufficient for a finding of gross mismanagement

of the estate, but simple misconduct can collectively demonstrate gross mismanagement of the

estate."  *Id.* (citing *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. at 857).  The inquiry focuses

only on the post-petition conduct of the Debtor.  *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. at

857.

53.   The involuntary petition in this case was filed on December 4, 2024.  Since then:

- On December 23, 2024, Gene McCubbin, the initial petitioning creditor in this case, in coordination with the Debtor and Mr. Choudhri recorded a *lis pendens* against the Property as Instrument No. RP-2024-477576 in violation of several orders entered in *Galleria II*;[76]

- On January 15, 2025, the Debtor, through its in-house counsel and at the direction of Mr. Choudhri, emailed a title company, instructing it "not take any action with respect to the sale of the [Property] until [an unrelated] appeal is resolved" to frustrate Houston 2425's use and enjoyment of the Property and in violation of several orders entered in *Galleria II*;[77]

- On January 23, 2025, the Debtor filed a lawsuit in Harris County styled *Jetall Companies, Inc. v. Jackson Walker, LLP, et al.*, Cause No. 2025-04456, in violation of several orders entered in *Galleria II*;[78]

---

[76] Conrad Dec., ¶ 6, Ex. 3.

[77] Conrad Dec., ¶ 7, Ex. 4.

[78] Conrad Dec., ¶ 8, Ex. 5.  For context, on November 29, 2024, the Debtor filed a lawsuit in the Harris County District Court against Jackson Walker, Houston 2425, and others ("*JW I*") claiming that it retained an interest in the Property through an alleged lease.  *JW I* was thereafter promptly removed to this Court.  Case No. 24-03257, ECF No. 1.  On December 2, 2024, the Debtor also filed a *lis pendens* referring to *JW I*.  On December 6, 2024, this Court entered two orders, enforcing the Sale Order, canceling this first *lis pendens*, and further enjoining the Debtor or any of its affiliates, agents, or principals from filing additional *lis pendens* against the Property.  Case No. 23-34815, ECF Nos. 871 & 872.  Houston 2425 then moved to enforce the gate-keeping provision of the confirmed plan, and this Court issued a final order of dismissal of *JW I* on January 7, 2025.  Case No. 24-03257, ECF No. 17.

4911-9170-8700.v7

- On January 23, 2025, the Debtor recorded a third *lis pendens* against the Property as Instrument No. RP-2025-23705 in violation of several orders entered in *Galleria II*;[79]

- On January 24, 2025, the Debtor recorded a fourth *lis pendens* against the Property as Instrument No. RP-2025-25888 in violation of several orders entered in *Galleria II*;[80]

- On January 29, 2025, Mr. Choudhri, putatively on behalf of the Debtor, sent a second email to the title company to frustrate Houston 2425's use and enjoyment of the Property and in violation of several orders entered in *Galleria II*;[81]

- On February 14, 2025, the Debtor failed to file the information required by Bankruptcy Rule 1007(a) and this Court's February 6, 2025, Order; and

- On February 21, 2025, the Debtor failed to file the information required by Bankruptcy Rule 1007(b), § 521, and this Court's February 6, 2025, Order.

54.     All these events postdate the petition in this case.  And they go far beyond simple mismanagement, or even simple misconduct.  This Court has already determined that the Debtor's acts were in "blatant disregard" of its prior orders.[82]  As a result, it held the Debtor (and others) in contempt and sanctioned them $50,000 (half payable to the court and the remainder to NBK and its counsel).  The Debtor also incurred legal expenses, both internal and external, to draft, file, and prosecute the various documents and proceedings.  The incurrence of those costs has no feasible benefit to the Estate or its creditors.

55.     There is hardly a clearer example of gross misconduct and gross mismanagement of the estate than repeatedly filing frivolous lawsuits and *lis pendens* in violation of court orders, engaging in other sanctionable conduct, and willfully failing to file statements and schedules required by the Bankruptcy Code, Bankruptcy Rules, and this Court's orders.  All these things

---

[79] Conrad Dec., ¶ 9, Ex. 6.

[80] Conrad Dec., ¶ 10, Ex. 7.

[81] Conrad Dec., ¶ 11, Ex. 8.

[82] Case No. 23-34815, ECF No. 995.

were done in violation of the Debtor's fiduciary duties to its creditors. Combined with the Debtor's failure to provide financial transparency, this conduct leads to the conclusion that the Debtor should not—indeed, cannot—be trusted to continue acting in a fiduciary capacity. It has not proven willing or capable of discharging its duties in good faith and in the best interests of its beneficiaries. Cause exists under § 1112(b)(4)(B) to convert this case.

3.   <u>Cause exists under 11 U.S.C. § 1112(b)(4)(M) because the Debtor has no hope of confirming a plan.</u>

56.   Conversion is also appropriate where a debtor cannot "effectuate substantial consummation of a confirmed plan." 11 U.S.C. § 1112(b)(4)(M). This determination turns on "practical considerations, including whether confirmation can be achieved." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011). A finding that "reorganization is simply not possible and [that] liquidation is the only feasible alternative" is sufficient ground to convert. *See In re Fossum*, 764 F.2d 520, 522 (8th Cir. 1985).

57.   A debtor cannot effectuate a plan where it "lacks the ability to formulate a plan or to carry one out." *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989). "Such a finding may also be premised on the practical considerations of the case, and whether the Court thinks that a debtor would be able to submit a plan, achieve confirmation and carry it out." *In re Brooks*, 488 B.R. 483, 491 (Bankr. N.D. Ga. 2013). Put simply, section 1112(b) allows the Court "to cut short th[e] plan and confirmation process where it is pointless." *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994). Creditors "need not incur the added time and expense of a confirmation hearing on a plan they believe cannot be confirmed" before seeking relief under § 1112(b). *See id.* And the Court "need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired" before granting that relief. *See id.*

25

58.     As discussed above, the Debtor has no hope of a successful reorganization; it simply is not feasible.  The Debtor appears to have little, if any, income, and any prospect is growing smaller every day with several Choudhri-controlled properties, which the Debtor claims to manage, tied up in bankruptcies destined for liquidation or § 363 sales.  On the other side of the coin, creditors have already filed more than $3.5 million in claims in this case—in addition to the amounts claimed by the Petitioning Creditors, amounts owed to NBK and Houston 2425 for failure to pay for use and occupancy before being compelled to vacate the Property, and the amounts owed to this Court and to NBK and Houston 2425 and its counsel as sanctions in *Galleria II*.  Proceeding through the confirmation process would be pointless.  It will only serve to drive up costs and unfairly prejudice the Debtor's legitimate creditors.  Cause exists under section 1112(b)(4)(M) to convert this case.

4.     Cause may also exist under 11 U.S.C. § 1112(b)(4)(A) because the Debtor has no chance of rehabilitation.

59.     Section 1112(b)(4)(A) permits the Court to convert a case where there is both: (a) a substantial or continuing loss to or diminution of the estate; and (b) the absence of a reasonable likelihood of rehabilitation.  Each requirement is discussed in turn.

a.     *Substantial or Continuing Loss*

60.     "[C]ourts must look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate."  *In re Ozcelebi*, 639 B.R. 365, 384 (Bankr. S.D. Tex. 2022) (quotation omitted).  Any loss or diminution of the Estate "should not continue . . . beyond the point at which reorganization no longer remains realistic." *Id.*  "The loss may be substantial or continuing; it need not be both."  *Id.*  "If the loss is sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the loss is substantial." *Id.*

26

61.     "Negative cash flow and an inability to pay current expenses" can also satisfy the standard. *In re M.A.R. Designs & Const., Inc.*, 653 B.R. at 856 (citation omitted).  "In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow, including that resulting from administrative expenses, effectively comes straight from the pockets of creditors and is sufficient to satisfy the first element of § 1112(b)(1)." *Id.* (citation omitted).

62.     The Debtor has not yet provided any financial disclosures—a basis to find cause itself.  Its filings in other proceedings, however, demonstrate that the Estate has insufficient cash-generating abilities to meet its current expenses or to fund a plan.  At least as to the Property, it cannot be disputed that the Debtor has ceased business operations.  The same is likely true with respect to other Choudhri-owned properties the Debtor claims to manage, especially those currently in bankruptcy or state-court foreclosure proceedings.  When the Debtor does provide financial disclosures, it is likely they will show that the Debtor has negative operating cash flow and that all administrative expenses to fund a chapter 11 plan will be borne by the Estate's creditors.  This is sufficient to demonstrate "substantial or continuing loss."

        b.     *Absence of Reasonable Likelihood of Rehabilitation*

63.     "Rehabilitation does not mean reorganization, which could involve liquidation. Instead, rehabilitation signifies something more, with it being described as to put back in good condition; re-establish on a firm, sound basis." *In re TMT Procurement Corp.*, 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015) (quotation and citation omitted).  "The issue of rehabilitation for purposes of Section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort." *Id.* (quotation omitted).

64.     "The Court must consider whether Debtor's continuing losses can be corrected and whether Debtor or another party in interest is capable of performing the necessary remediation to re-establish Debtor's business." *In re Ford Steel, LLC*, 629 B.R. 871, 880 (Bankr. S.D. Tex. 2021) (citation omitted).   The "Debtor must 'do more than manifest unsubstantiated hopes for a successful reorganization.'" *Id.* (quotation omitted).  The "remediation plan must be realistic with a reasonable possibility of success." *Id.* (citation omitted); 7 Collier on Bankruptcy ¶ 1112.04(6)(a)(ii) (16th ed. 2017) ("Visionary schemes that entail risk to creditors without any reasonable probability of success usually warrant prompt conversion to chapter 7.").

65.     There is no rational hope of rehabilitation in this case.  Principally, it is entirely unclear whether some or all the Debtor's assets and operations have been transferred to another Choudhri-owned entity, Jetall Capital.  As discussed above, Mr. Choudhri has already redirected web traffic from the www.jetallcompanies.com domain to the www.jetallcapital.com domain, seemingly a concession that even the Debtor's principal does not believe rehabilitation is likely.  But, even if the Debtor is still operating, its primary business function, running Mr. Choudhri's properties, cannot be reestablished on a firm, sound basis because the Property and likely others have been removed from Mr. Choudhri's control.[83]  Without those, the Debtor has no business prospects at all, let alone ones that justify continuing the reorganization effort.  Beyond that, it does not appear that the Debtor wishes to reorganize or rehabilitate.  The Debtor has failed to comply with its obligations (imposed by the Bankruptcy Rules and this Court's orders) to provide financial information.  Because the Debtor is unwilling, but more importantly, unable to lead the reorganization, the Court and the Debtor's creditors are left to wonder who will.  The lack of an

---

[83]  And, as noted above, there are strong indications that Mr. Choudhri may have stripped the Debtor of assets and opportunities through which to reorganize through Jetall Capital.

ability to generate revenue and a willingness to rehabilitate are sufficient to satisfy § 1112(b)(2)'s second prong.

### D. Conversion, Rather Than Dismissal or Appointment of a Trustee, Is in the Best Interests of Creditors

66.      Once § 1112(b) cause has been established, the Court must determine whether conversion or dismissal is in the best interests of creditors and the estate.  11 U.S.C. § 1112(b)(2); *In re Shea, Ltd.*, 545 B.R. 529, 535 (Bankr. S.D. Tex. 2016).  The Court may decline to convert or dismiss only if the Debtor demonstrates the existence of "unusual circumstances" such that dismissal or conversion would be inappropriate.  *Id.*

67.      In evaluating whether conversion or dismissal is appropriate, courts do not apply a bright-line test.  Instead, courts consider a multitude of factors, including:

> (1) Whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal; (2) Whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) Whether the debtor would simply file a further case upon dismissal; (4) The ability of a trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) In assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) Whether any remaining issues would be better resolved outside the bankruptcy forum; (7) Whether the estate consists of a 'single asset'; (8) Whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) Whether a plan has been confirmed and whether any property remains in the estate to be administered; and (10) Whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*In re Premier Golf Properties, LP*, 564 B.R. 710, 723 (Bankr. S.D. Cal. 2016) (quotation omitted).

68.      Ultimately, the decision turns on whether the economic value of the estate is greater inside or outside of bankruptcy.  *In re Turkey Leg Hut & Co. LLC*, 665 B.R. at 143.  This analysis generally involves assessing "what assets would be available for a Chapter 7 trustee to liquidate and administer for the benefit of unsecured creditors if the case were converted."  *Id.* (citation omitted).

69.     Here, nearly all factors—and the Debtor's economic value inside versus outside of bankruptcy—support conversion rather than dismissal.  First, it is virtually certain that some creditors have received preferential payments from the Debtor and that equality of distribution would be better served by conversion.  Mr. Choudhri has admitted that he used the Debtor to make payments on behalf of its statutory insiders and affiliates, including Galleria 2425.  It is also likely, if the case were dismissed, that Mr. Choudhri will continue to cause the Debtor to make preferential payments to himself or other entities he owns or controls rather than bona fide, third-party creditors.[84]  This supports conversion.

70.     Second, it is likely that the Debtor will find itself in bankruptcy again if this case is dismissed rather than converted.  As discussed above, the Debtor, its principal, and its affiliates are no strangers to using the Bankruptcy Court as a cudgel to delay or avoid paying creditors.  Also as discussed above, there are other pending bankruptcy proceedings that either directly or tangentially involve the Debtor.  This Court—and, more importantly, the Debtor's creditors—have no assurance that a follow-up bankruptcy is not imminent.  This also supports conversion.

71.     Third, a chapter 7 trustee will likely be able to reach assets for the benefit of creditors that could not be realized outside of bankruptcy.  This Court has already stated that it "believes that further investigation is in the best interest of the creditors due to the allegations set forth in the objections [to dismissal] and the Court's own experience with the parties."[85]  That investigation will, very likely, reveal valuable chapter 7 causes of action against the Debtor's insiders and affiliates.  Those can be best liquidated and distributed through a bankruptcy

---

[84] NBK does not concede that any of the Petitioning Creditors have valid claims against the Estate.  It only notes that, if they do, an equitable distribution is more likely inside of bankruptcy through a chapter 7 proceeding than it is outside of bankruptcy if the case were dismissed.

[85] ECF No. 39.

4911-9170-8700.v7

proceeding and will, likely, be lost if the case is dismissed.  This counsels strongly in favor of conversion.  *See In re Turkey Leg Hut*, 665 B.R. at 143 (noting the court may consider potential actions under chapter 5 in determining whether to convert or dismiss); *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. at 873 (finding conversion to chapter 7 appropriate where "numerous findings of bad faith and gross mismanagement of the estate" indicated a need for a trustee to investigate and liquidate assets).

72.     Fourth, conversion will maximize the estate's value as an economic enterprise for at least two reasons.  One, a chapter 7 trustee will be able to investigate, pursue, and liquidate chapter 5 and other estate causes of action, bringing dollars into the estate.[86]  Two, a chapter 7 trustee will be able to put a definite stop to the Estate's never-ending litigation spend.  NBK is unaware of all the lawsuits that Mr. Choudhri has caused the Debtor to file over the past several years or where those lawsuits are procedurally.  NBK is also unaware of all the lawsuits that have been filed against the Debtor.  But, on information and belief, the combined number is significant—likely more than 25.[87]  Converting the case would allow a chapter 7 trustee to dismiss and end any that are meritless, stopping spend, and pursue any that truly warrant prosecution, potentially adding value to the distribution pool.  This supports conversion also.

73.     Fifth, this Court has already found that the Debtor (and those that control or are affiliated with it) engaged in misconduct.  Significant questions remain regarding the Debtor's

---

[86] A chapter 7 trustee may also determine that substantive consolidation is warranted, potentially expanding the pool of distributable assets.

[87] The Department of Justice recently attempted to discover exactly how many lawsuits the Debtor's principal, Mr. Choudhri, was a party to.  It found: "Mr. Choudhri or companies that he controls have been a plaintiff or defendant in at least 136 separate state or federal cases since approximately 2003, approximately 34 of which are currently open and active."  Case No. 23-mc-01644, ECF No. 60.  A similar observation was made by this Court, stating: "[t]he Court additionally stresses that [Mr. Choudhri] has a large litigation history, not only in this case but various bankruptcy cases scattered through the Southern District of New York."  Case No. 23-34815, ECF No. 565.  This Court identified 24 of those proceedings in a footnote.  *Id.*, at 17 n.48.

financial transparency, business operations, and potential improper transfers to its insiders and affiliates, including Jetall Capital. There are valid concerns about whether the Debtor's assets and business operations have been improperly transferred to Jetall Capital or to another of Mr. Choudhri's entities to shield them from creditors. A chapter 7 trustee would be uniquely positioned to investigate these issues, recover any fraudulently or preferentially transferred assets, and administer the estate for the benefit of creditors. A chapter 7 trustee also would be uniquely positioned to investigate whether there are viable *alter ego* or substantive consolidation claims against Mr. Choudhri and his other enterprises. Further, the Debtor's past misconduct in this case and others—such as refusing to vacate the Property and disregarding multiple court orders— strongly suggests that conversion is necessary to prevent further bad-faith conduct. Converting the case would allow a neutral fiduciary both to end the ongoing misconduct and to investigate and prosecute claims that the Debtor holds against its insiders and affiliates to compensate it for any harm caused by their misconduct. This, too, counsels in favor of conversion.

74. Sixth, no plan of reorganization has been proposed. Nor is one likely to be proposed. Nor is one likely to be confirmed. It does not appear that the Debtor has any revenue generating business to fund a plan. And, even if it did, it is unlikely that the Debtor can generate enough free cash flow to overcome objections by impaired creditors. In all likelihood, the only plan that could be confirmed in this case would be a liquidating one. It would be quicker and less expensive to accomplish that same goal through chapter 7 than it would through chapter 11.

75. Appointment of a chapter 11 trustee would not serve creditor interests in this case. The Debtor has no viable path to reorganization. Courts recognize that a Chapter 7 trustee is preferable where the debtor's financial condition, mismanagement, and bad faith demonstrate that reorganization is not feasible. *See In re M.A.R. Designs*, 653 B.R. at 873 (converting to chapter 7

because debtor had engaged in bad faith conduct and had no path forward under chapter 11). The Debtor's apparent lack of employees, unclear business model, and failure to provide financial disclosures as required by the Bankruptcy Rules and Code confirm that continuing in chapter 11, even with a trustee, would serve no legitimate purpose. Finally, appointing a chapter 11 trustee would impose unnecessary administrative expenses on the estate, further reducing the potential recovery for creditors. By contrast, a chapter 7 trustee could immediately take control of the estate, liquidate assets, and distribute proceeds to creditors without the additional costs of continuing under chapter 11. A liquidation process under chapter 7 is the best and most appropriate path forward.

76.     The totality of the circumstances demonstrates that conversion to chapter 7 is in the best interests of creditors and the estate. Dismissal would reward the Debtor's misconduct and allow it to continue evading creditor claims. Appointment of a chapter 11 trustee would be an unnecessary and inefficient alternative given that the Debtor has no realistic prospects for reorganization. Accordingly, the Court should convert the case to chapter 7 to ensure that an independent trustee can take control of the estate, investigate potential asset transfers and other causes of action, and maximize creditor recovery.

## CONCLUSION

77.     For the foregoing reasons, the Court should grant this Motion and convert the Debtor's case from one under Chapter 11 to one under Chapter 7. A form of order is attached as Exhibit B for the Court's consideration and use.

4911-9170-8700.v7

Dated: February 22, 2025

**SHANNON & LEE LLP**

*/s/ R. J. Shannon*
    R. J. Shannon
    Tex. Bar No. 24108062
    Kyung S. Lee
    Tex. Bar No. 12124800
    2100 Travis Street, Suite 1525
    Houston, TX 77002
    Telephone: (713) 714-5770
    rshannon@shannonleellp.com
    klee@shannonleellp.com

***Counsel to Christopher R. Murray,
Liquidation Trustee***

**PILLSBURY WINTHROP SHAW
PITTMAN LLP**

*/s/ Andrew M. Troop*
    Charles C. Conrad
    Tex. Bar No. 24040721
    S.D. Tex. Fed. ID No. 37220
    L. James Dickinson
    Tex. Bar No. 24105805
    S.D. Tex. Fed. ID No. 3611267
    609 Main Street Suite 2000
    Houston, TX 77002
    Telephone: (713) 276-7600
    Facsimile: (713) 276-7673
    charles.conrad@pillsburylaw.com
    james.dickinson@pillsburylaw.com

    - and -

    Andrew M. Troop
    Mass. Bar No. MA547179
    S.D. Tex. Fed. ID No. 30089813
    Patrick E. Fitzmaurice
    Admitted *pro hac vice*
    31 West 52nd Street
    New York, NY 10019-6131
    Telephone: (212) 858-1000
    Facsimile: (212) 858-1500
    andrew.troop@pillsburylaw.com
    patrick.fitzmaurice@pillsburylaw.com

***Counsel for National Bank of Kuwait,
S.A.K.P., New York Branch***

4911-9170-8700.v7

## **CERTIFICATE OF SERVICE**

I certify that, on February 22, 2025, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, which will send a Notice of Electronic Filing to counsel of record for the parties to this case.

/s/ Andrew M. Troop
Andrew M. Troop

4911-9170-8700.v7